1
2
3
4
5
6       IN THE UNITED STATES DISTRICT COURT
7
8       FOR THE NORTHERN DISTRICT OF CALIFORNIA
9
10
UCP INTERNATIONAL COMPANY                    No. C 16-07255 WHA
11
LIMITED and GLOBAL UNITED
ENTERPRISES LIMITED,
12
            Plaintiffs,
13
    v.                                       **ORDER GRANTING MOTION
14                                           TO DISQUALIFY NEWLY-
BALSAM BRANDS INC. and BALSAM                ADDED COUNSEL**
15
INTERNATIONAL UNLIMITED
COMPANY,
16
            Defendants.
17 ────────────────────────────────────── /

18                        **INTRODUCTION**
19
        After two years of litigation over two patents and the extent to which they cover artificial
20
Christmas trees, the patent owners retained, as additional litigation counsel, the former law firm
21
of the then-presiding judge, who was already immersed in the case. The judge then recused
22
himself, as he had done four times in four separate cases in recent years after appearances by his
23
former firm. Following his recusal, this action was reassigned and the accused infringer moved
24
to disqualify the former law firm. This order now disqualifies the former law firm. A notice will
25
be filed to invite the originally-assigned judge to relate the action back under our local rules, so
26
that he may resume presiding over the case.
27                         **STATEMENT**
28
        This patent infringement dispute involves artificial Christmas trees and has provoked two

back-to-back civil actions in our district court, both assigned to the Honorable William

1    Orrick, III.  The first was *Balsam Brands Inc. v. Cinmar, LLC*, No. C-15-04829-WHO, filed by

2    patent owners Balsam Brands Inc., Balsam International Limited, and Balsam International

3    Unlimited Company (collectively, "Balsam") against Frontgate Marketing, Inc., and Cinmar,

4    LLC (collectively, "Frontgate").  Frontgate, a catalog and online retailer, sold the accused

5    artificial invertible Christmas trees called Inversion Trees made by UCP International Company

6    Limited and Global United Enterprises Limited (collectively, "UCP") (Dkt. No. 60 at 1–2).  The

7    first lawsuit will be referred to as *Frontgate*.

8         Two months before Christmas 2015, Balsam sought a temporary restraining order against

9    Frontgate, which Judge Orrick denied in a 19-page order (*Frontgate*, Dkt. Nos. 11, 42).  UCP

10   was not sued, but its tree dominated the *Frontgate* litigation, so UCP defended Frontgate under

11   an indemnity arrangement (Dkt. Nos. 60 at 1–2, 79 at 3).

12        Judge Orrick eventually issued a 22-page claim-construction order in *Frontgate* (Dkt. No.

13   108).  Frontgate then indicated it would file a motion for summary judgment of non-infringement

14   based on that order, but the case settled in December 2016.

15        The same day as the dismissal, UCP filed this action seeking a declaratory judgment of

16   non-infringement against Balsam.  This second action also went to Judge Orrick and involves the

17   same trees and the same patents, the only difference being that this suit involves the tree

18   manufacturer rather than the tree marketer.

19        Judge Orrick ordered the parties to meet and confer over a stipulated procedure for

20   importing the *Frontgate* claim-construction order and claim-construction record, advising that he

21   intended to rely on his prior work and rulings in his claim-construction order and to resolve any

22   lingering claim-construction disputes on summary judgment.  He set a tentative deadline of

23   June 27 for UCP to file a summary judgment motion (*see, e.g.*, Dkt. No. 58 at 8:14–25, 10:3–22).

24        Shortly after those statements by Judge Orrick, Balsam added Jonathan Bass and his firm

25   Coblentz Patch Duffy & Bass LLP as additional counsel (Dkt. No. 68).  Coblentz is Judge

26   Orrick's former law firm, where he practiced from 1984 to 2009 and then again from 2012 to

27   2013 (Dkt. No. 89-1).  (From 2009 to 2012, he worked at Main Justice in Washington, D.C.)

28   Attorney Bass was a long-time law partner of Judge Orrick.

1    Shortly after the appearance of his former law firm as additional counsel for Balsam,

2  Judge Orrick recused himself on June 28, causing the case to be randomly reassigned to a fresh

3  judge.  Almost immediately after Judge Orrick's recusal, Balsam filed a motion arguing that

4  reassignment of this action had somehow nullified Judge Orrick's decision to rely on his own

5  prior claim-construction order because "the parties [now] don't know whether *this* Court will

6  apply the same claim constructions that UCP uses throughout its [summary judgment] motion."

7  Balsam further argued that "if this Court determines collateral estoppel does *not* apply to the

8  earlier constructions, the Court will need to enter its own claim constructions, which could differ

9  from Judge Orrick's" order, and would need to be settled in advance of any briefing on UCP's

10  motion for summary judgment (*see* Dkt. No. 73 at 3–4).

11    UCP now moves to disqualify the Coblentz firm and to send the case back to Judge

12  Orrick.  This order follows full briefing and oral argument, including supplemental briefing from

13  both sides, plus an opportunity for an evidentiary hearing, which both sides declined.

14                                               **ANALYSIS**

15    Our court of appeals has not yet spoken on disqualification of an attorney whose

16  appearance has resulted or will result in a judge's recusal.  Other circuits that have considered

17  the question have held that disqualification may be warranted depending on the circumstances.

18  *See In re BellSouth Corp.*, 334 F.3d 941, 962–65 (11th Cir. 2003); *In re FCC*, 208 F.3d 137,

19  139–40 (2d Cir. 2000);  *Robinson v. Boeing Co.*, 79 F.3d 1053, 1054–56 (11th Cir. 1996);

20  *McCuin v. Tex. Power & Light Co.*, 714 F.2d 1255, 1257 (5th Cir. 1983).

21    In *McCuin*, the Fifth Circuit held "a lawyer may not enter a case for the primary purpose

22  of forcing the presiding judge's recusal."  714 F.2d at 1265.  Other more persuasive circuit court

23  decisions, however, have since recognized the potential drawbacks of relying on a subjective test

24  and instead favored an objective test.  *See Robinson*, 79 F.3d at 1055 ("No matter how extensive

25  the discovery may be, the true motive will be elusive, non-objective and not likely truly

26  ascertainable."); *see also BellSouth*, 334 F.3d at 947 (noting the practical impossibility of

27  proving a party's true motivations); *FCC*, 208 F.3d at 139–40 (noting that disqualification of

28

3

1    counsel was based not on the firm's intent, but on counsel's failure to consider in advance the

2    known or knowable risk of a judge's recusal).

3           The Eleventh Circuit in *Robinson* and *BellSouth* identified the following objective factors

4    to consider and balance in the disqualification analysis:  (1) the potential for manipulation or

5    impropriety, (2) the judicial time invested, (3) the court's docket, (4) the delay in reaching

6    decision, (5) the injury to the other party, (6) the fundamental right to counsel, and (7) the

7    expense to the party that retained counsel.  *Robinson*, 79 F.3d at 1055; *BellSouth*, 334 F.3d at

8    962–66.  These factors are not exclusive, nor are they all necessary.  Their weight will vary with

9    the circumstances.  *BellSouth*, 334 F.3d at 962.

10          Where the objective factors weigh in favor of disqualification, a party resisting such

11    disqualification must show an overriding need for its choice of counsel, *i.e.*, a need that would

12    reflect upon its ability to have its case fairly presented.  *See Robinson*, 79 F.3d at 1054–56.

13          This order will apply the objective test set forth by the Eleventh Circuit in *Robinson* and

14    *BellSouth*, expecting that our own circuit will follow the Eleventh Circuit, for two reasons.

15    *First*, the objective test avoids the attorney-client privilege barriers attendant to any inquiry into

16    the true purpose of or motive behind counsel's appearance.  *Second*, the objective test better

17    comports with preservation of public trust.  Specifically, judicial recusal following appearance of

18    counsel mid-stream implicates two interests important to preservation of public trust.  One is to

19    prevent even the appearance of manipulation to angle for a particular judge or angle away from a

20    particular judge.  Another is to preserve the investment of time and effort by an assigned judge

21    and, conversely, to avoid a waste of judicial resources as a result of having to go through it all

22    over again with a new judge upon a recusal by the original judge.

23          Balsam opposes an objective test and favors a subjective test.  Not surprisingly, it insists

24    that recusal wasn't on its mind in bringing in Judge Orrick's former law firm.  This order holds

25    that the objective *Robinson/BellSouth* test should apply here and rejects Balsam's arguments to

26    the contrary.

27          *First*, in the spirit of *fait accompli*, Balsam contends *Robinson* and *BellSouth* involved

28    motions for leave to add counsel, not motions to disqualify counsel who have already appeared.

4

1    This is a distinction without a difference where, as here, it is clear that other *Robinson/BellSouth*

2    factors are implicated. *See BellSouth*, 334 F.3d at 962. Decisions have also applied the

3    *Robinson*/*BellSouth* test in the context of motions to disqualify. *E.g.*, *In re RFC & Rescap*

4    *Liquidating Trust Litig.*, Civil Nos. 13-3506 (SRN/HB), 13-3451 (SRN/HB), 2016 WL 7177706,

5    at *5–9 (D. Minn. Dec. 8, 2016) (Chief Judge John Tunheim); *Hunters Run Apartments Ltd. v.*

6    *WCA Waste Corp.*, Case No. 1:15-CV-00151-MP-GRJ, 2016 WL 9086970, at *2–4 (N.D. Fla.

7    Apr. 25, 2016) (Judge Maurice Paul); *Glover v. Standard Fed. Bank*, No. CIV 97–2068 DWF

8    SRN, 2001 WL 228440, at *2 (D. Minn. Mar. 6, 2001) (Judge Donovan Frank).

9         *Second*, Balsam contends *Robinson* and *BellSouth* support only the proposition that

10    counsel may be disqualified when their appearance in a case results in the presiding judge's

11    *mandatory* disqualification pursuant to Section 455(b) of Title 28 of the United States Code,

12    whereas in this instance — according to Balsam — Attorney Bass's appearance "did not require

13    Judge Orrick's recusal" (Dkt. No. 89 at 6–8). In support of its contention, Balsam cites decisions

14    for the proposition that Judge Orrick was also not required under Section 455(a) to recuse

15    himself because of his previous employment. *See, e.g.*, *In re Complaint of Judicial Misconduct*,

16    816 F.3d 1266, 1268 (9th Cir. 2016); *Singer v. Wadman*, 745 F.2d 606, 608 (10th Cir. 1984).

17         Balsam's argument misses the point. The appearance of manipulation or impropriety in

18    our judicial system — *e.g.*, the appearance of judge-shopping — threatens to erode public trust

19    irrespective of whether the underlying facts technically concern mandatory disqualification

20    versus voluntary recusal of the presiding judge. Indeed, no component of the

21    *Robinson*/*BellSouth* test suggests that the test's underlying rationale is limited to circumstances

22    featuring mandatory disqualification as opposed to near-certain voluntary recusal. Balsam's

23    attempt to read this limitation into the *Robinson* and *BellSouth* decisions is unpersuasive.

24         This order now turns to consideration of the objective factors set forth by the

25    *Robinson*/*BellSouth* test, as applied to the facts of this case.

26         **1.    THE POTENTIAL APPEARANCE OF MANIPULATION OR IMPROPRIETY.**

27         While motions to disqualify counsel are generally strongly disfavored and subject to

28    "particularly strict judicial scrutiny," the "paramount concern must be the preservation of public

5

1  trust both in the scrupulous administration of justice and in the integrity of the bar." *See Optyl*

2  *Eyewear Fashion Int'l Corp. v. Style Cos., Ltd.*, 760 F.2d 1045, 1050 (9th Cir. 1985); *State Farm*

3  *Mut. Auto. Ins. Co. v. Fed. Ins. Co.*, 72 Cal. App. 4th 1422, 1428 (1999).  Accordingly, "[t]he

4  recognizably important right to choose one's counsel must yield to the ethical considerations that

5  embody the moral principles of our judicial process." *State Farm*, 72 Cal. App. 4th at 1428.

6        The purpose of our district's random assignment process is, among other things, to

7  "[e]nsure that cases are randomly and blindly assigned." *General Order No. 44 Assignment*

8  *Plan*, N.D. CAL., www.cand.uscourts.gov/filelibrary/132/GO-44_6.20.17.pdf (last amended

9  June 20, 2017).  Our random-assignment process aims to ensure the integrity of the judicial

10  system and is taken quite seriously by our judges, to eliminate any hint of the appearance of

11  judge- or case-shopping.  Even the appearance of judge-shopping would "doubtless disrupt[] the

12  proper functioning of the judicial system," and could "impair[] public confidence in the

13  impartiality of judges." *See Standing Comm. on Discipline of U.S. Dist. Court for Cent. Dist. Of*

14  *Cal. v. Yagman*, 55 F.3d 1430, 1443 (9th Cir. 1995); *Keilholtz v. Superior Fireplace Co.*, No. C

15  08-00836 SI, 2008 WL 5411497, at *2 (N.D. Cal. Dec. 29, 2008) (Judge Susan Illston); *see also*

16  *BellSouth*, 334 F.3d at 962.

17        Balsam again argues that because Judge Orrick was not *required* to disqualify himself

18  under Section 445, there is no basis for inferring any attempted manipulation of this district's

19  assignment plan.  As stated, however, the distinction between mandatory disqualification and

20  voluntary recusal under these circumstances does not alter the analysis.  Regardless of whether

21  Judge Orrick was statutorily *required* to remove himself from this case, the point remains that

22  his recusal was a predictable consequence of Attorney Bass's appearance herein.  Judge Orrick

23  has uniformly recused himself in all four cases assigned to him in which his former law firm has

24  appeared — including as recently as April of this year.  Any objective member of the bar or the

25  public would have expected Judge Orrick to recuse himself in a fifth case, just as he had in the

26

27

28

6

prior four.[1]  In short, the appearance of mischief is as inherent in our circumstances as in cases where disqualification is mandated by statute.

Balsam next argues that the disqualification order in *BellSouth* was in direct response to an established pattern of prior abusive attempts to manipulate the Northern District of Alabama's random assignment of judges through the appearance of a judge's nephew (Dkt. No. 96 at 1–3). It is true that such a pattern lurked as a background fact in *BellSouth*, but that decision in no way suggested that every conflict firm somehow gets "one free bite."  As discussed, the circumstances attending Judge Orrick's recusal in this case alone are sufficient to threaten the appearance of impropriety. *See RFC*, 2016 WL 7177706, at \*6.  This order therefore holds that disqualification can occur even without a prior track record of manipulation.

Indeed, Balsam's arguments, insofar as they suggest that disqualification under the *Robinson/BellSouth* test requires both subjective intent and a prior track record of abuse (*see* Dkt. Nos. 89 at 11–12, 96 at 1–3), underscore the wisdom in relying on objective factors rather than trying to prove the subjective reasons for particular appearance of counsel.  Were we to accept Balsam's arguments, we would need to inquire into whether or not a prior pattern of manipulation existed.  In that connection, four judges in our district have recused themselves 52 times after the appearance of the Coblentz firm in cases assigned to them, usually at the outset of each case.[2]  With one arguable exception, these judges have never remained in a case after the Coblentz firm has appeared.  Judge Orrick, specifically, has not remained in a single case after Coblentz appeared.  In other words, there is a long, substantiated history of recusal by judges on our court who once were part of the Coblentz firm.  Balsam's view of *BellSouth* would thus require that we delve into these prior cases to ascertain the subjective motives of counsel and clients in retaining the Coblentz firm.  Any such subjective inquiry, however, would run head-on into attorney-client privilege and become unworkable.

---

[1] *Forge Grp. Power Pty. Ltd.*, Case No. 4:17-cv-02045; *Fuentes v. Dish Network, LLC*, Case No. 4:16-cv-02001; *United States v. Handl*, Case No. 3:15-cr-00126; *eBay, Inc. v. Dotcom Retail Ltd.*, Case No. 3:13-cv-02853.

[2] District Judges Charles Breyer, Edward Chen, and William Orrick, III, plus Chief Magistrate Judge Joseph Spero.

United States District Court

For the Northern District of California

1  Attorney Bass contended during oral argument that before disqualification of his firm, the

2  case should be sent back to Judge Orrick to see if he would seek consent of both sides to waive

3  any grounds for disqualification.  This argument is a non-starter.  Attorney Bass has no objective

4  basis to believe that Judge Orrick would ever exercise this option.  Judge Orrick certainly did not

5  seek such consent when he had the opportunity prior to recusing himself.  There is nothing to

6  suggest he would do so now.  It is clear that Judge Orrick routinely recuses himself upon

7  appearances by Coblentz attorneys without offering this option.

8  This factor weighs heavily in favor of disqualification of the Coblentz firm.

9  **2.    JUDICIAL TIME INVESTED, THIS COURT'S DOCKET, AND PROCEDURAL DELAY.**

10  In addition to the potential appearance of judge-shopping, a second issue arises when

11  appointment of counsel provokes a judge's recusal, *i.e.*, the considerable investment of

12  additional judicial time and resources when a new judge has to come up to speed on matters in

13  which the previous judge already mastered.

14  This action is indisputably a continuation of the *Frontgate* action, which was litigated for

15  a year before Judge Orrick prior to settling.  This action would undoubtedly have qualified as a

16  related action under both Civil Local Rule 3-12(a) and Patent Local Rule 2-1(1)(a)(1), which

17  requires actions concerning the same patent brought by the same plaintiff to be deemed related.

18  (In a declaratory-relief patent case, the defendant is really the plaintiff.)  He issued a 22-page

19  claim-construction order and has amassed substantial knowledge that would have been useful

20  when resolving any lingering claim construction disputes at summary judgment.  Reassignment

21  of this action to a new judge, if allowed to stand,  would cause major duplicative investment of

22  precious judicial resources (*see* Dkt. No. 96 at 4–5).

23  Furthermore, *Robinson* reasoned that "delay for *any* reason is sufficient" to bring the

24  rejection of additional counsel within the court's discretion.  79 F.3d at 1055.  Balsam's

25  argument that Judge Orrick's recusal has not resulted in any delay is off the mark (*see* Dkt. No.

26  89 at 9–10), given that the ensuing reassignment has already resulted in some postponement of

27  summary judgment briefing and the hearing date.  Additionally, Balsam's argument conveniently

28  omits that it actually sought additional time and further briefing following reassignment, and this

8

1  case will proceed more or less on schedule only because a prior order for the most part rejected

2  Balsam's requests for further delay (*see* Dkt. Nos. 73, 81).

3      This factor also weighs in favor of disqualification of the Coblentz firm.

4      **3.    INJURY TO UCP AND EXPENSE TO BALSAM.**

5      Other than asserting its fundamental interest to counsel — a point discussed in the next

6  factor below — Balsam does not allege that it would incur any particular expense if the Coblentz

7  firm is disqualified.  On the other hand, the appearance of the Coblentz firm and Judge Orrick's

8  subsequent recusal have resulted in a slight delay in the case schedule, which delay would have

9  been more significant had Balsam had its way (*see* Dkt. Nos. 73, 81).  Moreover, UCP is at

10  greater risk of prejudice than Balsam from Judge Orrick's recusal given that, just before said

11  recusal, UCP had filed an early dispositive motion — at Judge Orrick's instruction and based on

12  his prior claim-construction order — representing the culmination of nearly two years of hard-

13  fought litigation.  According to Balsam's own arguments, reassignment to a new judge at this

14  key juncture would possibly threaten to unravel the foundation of UCP's summary judgment

15  motion.  On balance, this order finds that these factors weigh slightly in favor of UCP.

16      **4.    FUNDAMENTAL RIGHT TO COUNSEL.**

17      Balsam argues that it has a fundamental right to its choice of counsel.  The undersigned

18  judge agrees that choice of counsel is generally a fundamental interest in civil litigation, but it is

19  important to note that this interest is not absolute.  *See, e.g.*, *BellSouth*, 334 F.3d 955–56.

20      Under the *Robinson/BellSouth* test, choice of counsel must sometimes yield to competing

21  factors.  The retention of counsel that results in a judge's recusal is permissible only if an

22  overriding need exists.  *See Robinson*, 79 F.3d at 1054–56.  This order finds unpersuasive

23  Balsam's suggestion that the phrase "overriding need" does not denote a general principle

24  because that phrase appeared in *BellSouth* only in connection with that district court's specific

25  requirement that the defendant demonstrate an "overriding need" for the judge's nephew as its

26  local counsel over any of the other local firms more than capable of filling a ministerial rather

27  than substantive role.  Balsam's narrow reading of the "overriding need" requirement is

28  inconsistent with how other decisions applying the *Robinson/BellSouth* test have construed it.

9

1        For example, in *Robinson*, "the fact that the case had been pending for fifteen months at

2   the time the motion was filed militate[d] against granting [the motion for leave to associate

3   additional counsel] in the absence of an overriding need for a particular lawyer."  Moreover, the

4   movant's explanation that it hired additional counsel because of their "knowledge of

5   employment-related matters and the vast resources of the firm that would enable it to handle the

6   complexities of this case" proved insufficient to establish an "overriding need."  *See Robinson*,

7   79 F.3d at 1054–56.

8        As another example, *Hunters Run*, applying the *Robinson/BellSouth* test, similarly

9   rejected a defendant's argument that it had "good and legitimate reason" for selecting counsel

10  because of counsel's case-specific expertise.  Judge Paul found this argument unpersuasive when

11  considered within the context of other applicable *Robinson/BellSouth* factors, including the "lack

12  of need by defendants for this particular counsel, and the potential delay and loss of judicial

13  activity."  2016 WL 9086970, at *4.  In short, Balsam has not shown any reason why the

14  "overriding need" requirement should not apply here.

15       In this action, Coblentz appeared only after more than twenty months of ongoing

16  litigation.  Balsam's original counsel in the *Frontgate* litigation, Marc Bernstein and The

17  Business Litigation Group, P.C., continue to represent it in this present action.  (In fact, two

18  attorneys from that firm attended the hearing on this motion.)  Attorney Bass and the Coblentz

19  firm are well-regarded and, for present purposes, most candid in acknowledging that, even if

20  Balsam retained him "to play a central role," there is simply no overriding need for Coblentz's

21  participation.  He does not even purport to be offering case-specific expertise, or to be the only

22  lawyer in San Francisco or California that could have met that criteria.

23       This order finds that the other objective factors here — including the potential

24  appearance of manipulation of the judicial process, Judge Orrick's substantial prior investment

25  of time and resources, and the likelihood of a new judge unnecessarily duplicating his efforts —

26  all outweigh any interest Balsam has in retaining the Coblentz firm, no matter how capable the

27  firm, given the absence of any overriding need for its presence.  In sum, this factor does not

28  prevent disqualification of the Coblentz firm under these circumstances.

1

**CONCLUSION**

2     For the foregoing reasons, this order disqualifies the Coblentz firm from appearing in this

3  civil action.

4     This order leaves the Coblentz firm free to appear as counsel at the outset of a case

5  assigned to a judge who once practiced at Coblentz (or for which there remains a further basis

6  for conflict).  This order concerns only the mid-stream appearances by the Coblentz firm in cases

7  before our judges who once practiced at Coblentz.  In these latter circumstances, the Coblentz

8  firm (or its client) must show an overriding need for its particular services, a showing that has

9  not been made here.

10

11     **IT IS SO ORDERED.**

12

13  Dated: July 19, 2017

14     WILLIAM ALSUP
     UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28

11